2420 from the District of South Dakota, United States v. Kenton Eagle Chasing. Mr. Bell, can you hear me? I can. Can you hear me? Yes, I can. Very good. Mr. Parsons. Mr. Parsons, if you would turn your camera back on and unmute your mic, please. Mr. Parsons, if you can hear me, you might want to disconnect and reconnect to the meeting. You may not have anticipated our getting an early start. Ms. Rudolph, do you have a separate telephone number you might be able to reach out to him at? Yes, I do, Your Honor. One moment. Thank you. I can hear you. Good morning. Okay, very good. We don't have video. Do you want to turn your camera on? Can you hear me? I can hear you. We don't have video. That's not critical, but do you want to turn your camera on? Hello. Mr. Parsons, can you hear me? I can hear you. Okay, we do have audio. We don't have any video. Okay, I will do that. Okay, very good. Judge Grunder, we're going to go forward with just audio with Mr. Parsons. Okay, very well. Mr. Bell, you may proceed. Thank you, Judge Grunder. My name is Justin Bell. I'm an attorney in Pierce, South Dakota. I represent Kenton Eagle Chasing in this appeal. Mr. Eagle Chasing raises several issues in his appeal. I do believe that I read that there's a certain amount of time that the court is going to give me to make a presentation before it interrupts, but I would waive that right if any of you decide to throw in any questions before I get to that. Thank you very much. May it please the court. Mr. Eagle Chasing was originally sentenced to 168 months based off of a second-degree murder on a petition to plea. That sentence also included a separate five-year supervised release sentence. We are here on the third revocation for Mr. Eagle Chasing. His first sentence was 10 months. His second revocation was for 20 months. His third and one present instance that we're at was a 30-month revocation. As relates to the facts here, and I'm not going to go into a lot of them because they don't, at least for some of the issues, don't necessarily apply, but he was at a Glory House, which is a halfway house in Sioux Falls, South Dakota. He began on May 1st of 2019. On July 7th of that year, he was attacked. He was stabbed. I know that that's an issue and one of the issues. And retreated from Glory House roughly 72 hours or less than 72 hours on the third day. He called up his probation officer, explained what happened. The probation officer told him that he would look into it at that point in time. He never did look into it. Instead, they filed a petition to revoke supervised release. There was a traffic stop based off of an alleged failure to stop at a stop sign in Eagle Butte, South Dakota, which is within the exterior boundaries of the Cheyenne River Sioux Tri-Reservation in South Dakota. There ended up being a following him for a couple blocks thereafter at a low speed after they activated lights on an unmarked police car, which resulted in his arrest on a warrant based off of that revocation. There was no tribal conviction. As it relates to the issues in this appeal, unless the court directs me otherwise, I'd like to first direct the court to the argument that 18 U.S.C. 3583E is unconstitutional in light of the Heyman decision. I don't know if the court has had an opportunity to visit the supplemental authority or look at the supplemental authority that was filed by the U.S. Attorney's Office on Monday. I filed a response yesterday that those deal with two cases in the Eighth Circuit. I want to address that before we primarily get into that. I would simply state that I don't believe that the two Eighth Circuit panel decisions are applicable to this case for two reasons. One, those cases specifically addressed Heyman only in a double jeopardy context. And what I mean by that is they relate to whether one of them relates to whether or not you're allowed to bring a subsequent criminal indictment based off of the same actions that were resulting from a supervised release violation and revocation separately. That panel decision said that that would not apply. However, that's a separate determination as to whether or not you have a right to a jury trial under the Heyman rationale of the plurality decision for that. The other decision was on plain air review. It also looked at double jeopardy. But certainly in this case, we're not on plain air review. The case was raised before the trial court, albeit the Heyman decision came down only a few, about a week before the revocation was raised in the trial court. Also, as stated in the brief of the appellant here, we don't dispute the fact that this is contrary to case law pre-Heyman from the Eighth Circuit. However, in light of Heyman and plurality opinions specifically, the underlying basis for the Eighth Circuit decisions on that has been undermined, quite frankly, because you can no longer take the position that supervised release revocations are simply parole or are akin to parole violations. There's a separate statutory provision and a separate crime, excuse me, a separate sentence under the Heyman decision. And so we would simply submit that under the rationale on the brief, these are not akin to parole revocations. The Heyman decision let open the decision as to whether or not a jury trial and the right to a jury trial attaches to these, but simply stated for the same reasons that were given in the dissent as to how the majority undermines this or the reasons why a right to a jury trial exists at this point. I will move on to other issues unless the court has any questions as it relates to that. Seeing none, I would ask the court, I would then move the court to the second issue of this raise, which is whether or not Judge Corman should have recused himself. And I'm going to be brief on this issue. I mean, the law on this is relatively clear. This paneling is aware of what it is, but there are several irregularities regarding this case. They give warrant and rise to why Judge Corman, the district court judge, should have recused himself, including filing an order stating that he's essentially prejudged the case and was looking at giving a sentence, not looking at the facts, just saying, I gave you a 20 months before. You should expect you're going to get more than that this time. He stated on the record in the sentencing that my client had good cause to not trust him as it relates to this. Those types of statements give the public a distrust in the judiciary, the warrant recusal from a district court judge. Did Judge Corman actually say you have good cause not to trust me? That's not my recollection of the statement, but I may be incorrect. Yeah, and I'm paraphrasing it. I got it. The exact quote is, petitioner is apparently concerned about, excuse me, that's the sentence. Excuse me, the exact quote I'm referring to is, I think he admitted that he doesn't trust the court system, and that may be for a valid reason. So excuse me, it's the court system, but that was for a valid reason. I mean, I believe that those types of statements reflect a disservice to the judiciary and give rise to a recusal in this situation. Specifically, given the orders that were stated, stating that, you know, that my client's request for recusal is probably well founded, and that's paraphrasing as well. And you look at the record and the exact language that was used, based off of the fact that he's likely going to see a sentence that is more severe than he previously got. And that was before there had even been a report of recommendation or a hearing on what the facts were at here, which I would simply submit are not that of rejust. Along those lines, when we talk about the facts and whether there's sufficient evidence in this case, there's two issues. One is whether or not there's a violation based off of a retreat, based off of an assault that takes place at a halfway house. And in that specific situation, he was chasing exactly what the standard order stated, which is if there's unforeseen reasons why you don't reside in a place, contact the probation office. He did that. He left within 72 hours. He contacted his probation officer, explained what happened. The probation officer said, hang tight. We'll check into it. And that's, once again, a paraphrase. Hold on. We'll check into it. It's very close. And never contacted him again. Just issued a petition to revoke and a warrant as relates to it. We would simply submit that's not a violation. That's not disputed. The facts as it relates to this are not disputed. As it relates to the traffic violations, that's briefed in pretty decent detail, but I will address a couple of things regarding that. Specifically, the traffic code issue, and it was an issue of dispute at the hearing, but the code for Shrine River Sioux Tribe has been submitted, of course, taken judicial notice or has been submitted for judicial notice as to what the code is. There's no dispute that the Tribal Court Council took action suspending the code. And that's not disputed. That's in the record. There's action. The only question that was raised by law enforcement from Shrine River is whether or not that was valid or not. But it's important to recognize that the amendment that allowed an eluding conviction in tribal court was adopted by the exact same method that the suspension of the traffic code for the tribal government took place. So either one of two things is true. Either the suspension of the traffic code is valid or the eluding ordinance that was adopted is invalid because that's not the proper procedure. That was never addressed by the government as it relates to this. In addition, you know, the case law that's been cited, the government has cited nothing as far as case law that would support the idea that an unmarked police vehicle with an element that includes that it be a marked police vehicle can be used for an eluding charge. I mean, this was a normal gray vehicle with tinted windows. So we would simply submit that based off of those facts. Yes. Why wouldn't the siren and the lights be enough to make it a marked vehicle? Well, I would note that it was an undercover vehicle or an unmarked vehicle, so you would only know it based off of them being on. It wasn't like there was lights that were visible to the plain eye, and that's in the record. A normal person just looking at it would view it as just a gray with tinted windows vehicle. There's testimony on that. Once you turn it on, there's activated lights. But I would simply just rely on the rationale given by this court's statement in the brief, Williams v. State, that there's no rational countervailing reasons that would negate that if every vehicle equipped with lights and sirens is a vehicle appropriately marked, then there would be no statutory language requiring the vehicle be appropriately marked. If the court were to adopt it just by having the ability to turn on the lights, that that's sufficient, then the court's completely reading out of the standard the requirement that it be a marked vehicle. Of course, the statutory construction maxim would say that this court is not supposed to just completely disregard or find that the legislature or city congress or the ordinance. Is that really true? Because signal is defined to include things broader than just lights and sirens. So is it necessarily surplusage in this situation? Well, I would say that signal is defined as including this, and I would submit that it is surplusage, Your Honor, as it relates to this. But it would require the signals. It's not just, and I understand I'm in my rebuttal time here, but the signal says it may be given by hand, voice, emergency light, or siren. So by inclusion of the emergency light or siren, I think that it becomes surplusage if you read out the fourth prong of that standard, Your Honor. But that's a good question. Regarding the substantive unreasonableness, I would only state that procedurally it appears that the court had taken into consideration factors that I ought not to make self-objections in the PSR. That issue is brief, and I'll reserve the rest of my time for rebuttal. Thank you. Very well. Thank you, Mr. Bell. Mr. Parsons, we now have video. Okay. Thank you. Can you hear me, Your Honors? Yes. Thank you. May it please the court, my good friend, Mr. Bell, Kenton Dane Eagle Chasing was actually a track star in high school and had college athletic scholarship offers, but his life since that time has been one of violence and drinking and crime of many varieties. He's been arrested more than 90 times by the Cheyenne River Sioux Tribal Police, even though he spent much of his adult life in prison. His first federal conviction was for beating someone over the head with an iron skillet, and when the Honorable Judge John Jones sentenced him in that case to 41 months in federal prison, he said, you have the potential to kill people when you're drinking. And, of course, that's what happened when he was released from prison for that term. He was playing dominoes with his cousin and his girlfriend. She woke up and knocked over the dominoes. He grabbed a kitchen knife, grabbed her throat, had his cousin put down a blanket on the floor, and then stabbed her in the heart after saying, this is what I'm going to do to you. So he was sentenced to 168 months in prison, five years of supervised release, and this is his third replication for that sentence. I didn't hear argument on the jurisdictional claim regarding Indian country. I'm prepared to argue that, but if there's not any questions, I will skip to Issue 2, which is the Haymond issue. As an initial matter, this argument is barred by this court's decisions, its precedent in United States v. Schearn and U.S. v. Ray and U.S. v. Bennett, which recognized and held consistent with U.S. Supreme Court precedent that the Sixth Amendment is limited to and that the rights the defendant is asserting do not apply to supervised release revocation proceedings, and that's based on Johnson v. United States. This court's decision in Haymond was expressly limited by all nine justices, the plurality, the concurring opinion which controls, and the dissent, by to Section 3583K, and all justices expressly joined opinions that said it has no application to 3583E3, which is what we're proceeding under. So Haymond does not apply, Apprendi does not apply, Elaine does not apply generally to revocation proceedings, but even if they did, this would not be a case where that rationale could be applied because nothing in Judge Corman's actions increased, or nothing in the statute that was applied by Judge Corman required the mandatory minimum to be increased based on judicial fact-finding alone or required the maximum sentence to be increased based on judicial fact-finding alone. In fact, the maximum authorized sentence in this case was life in prison. And so Haymond simply does not apply to revocation proceedings as, at a minimum, as directed by the controlling opinion in Haymond by Justice Breyer. I'll go to the recusal issue if I could. I would say that this is an unpersuasive argument made by my friend Mr. Bell. A judge's expressions of familiarity with the reprehensibility of the convicted conduct of a defendant who keeps appearing before him on successive charges is not an objective demonstration of bias. And I think the same goes for the general observation that defendants who keep violating the conditions of supervised release might expect harsher penalties upon each successive violation. The idea that the statement about, well, there may be some valid concerns about the judicial system as a whole that a Native American may have, I think that's the reading, the most obvious reading of Judge Corman's comment. Whether that's true or not, he said that may be true, maybe not, but that's nothing that affected this case. I think Judge Corman was just recognizing that some people do have concerns about whether or not the judicial system is fair, and Judge Corman made no definitive comment about that, and no one could credibly or accurately accuse Judge Corman of holding such a bias.  He was exceedingly familiar with the facts of the case. It's been going on for decades now, or more than a decade, and that's all his comments reflected. So I'll turn to the sufficiency of the evidence on the supervised release violations. The first one is that he broke, literally broke out of the treatment facility he was required to attend. He kicked in a window, out a window, and fled, absconded. And so that's the violation in and of itself. I think Judge Moreno in his fact-finding and Judge Corman in his affirming of that fact-finding, his de novo review of all that, recognized that just because you might later call your probation officer and let him know you fled, that doesn't excuse the violation in the first place. And so whether or not he got into a scuffle or a fight at the glory house, he was required to be there. He fled, and no one heard from him for three days. He fled many, many miles away back to Eagle Butte from Sioux Falls. And so that's in and of itself enough to affirm the revocation of his supervised release. The issue of the traffic code violation, the testimony in the record on page 72 of the transcript was that the officer that applies the traffic code has familiarity with how it was enacted, testified it was in effect on that day in 2018. There was some unclear testimony about whether the 1978 code had been suspended at one point by the chief judge. But the testimony was it was reinstated by the chief judge. And a lot of the documents in the record are resolutions, as the testimony explains, resolutions that weren't necessarily enacted by the council. And so everyone on the Cheyenne River Sioux Tribe believes they have a valid traffic code. And Judge Moreno, as the magistrate judge, found that they did, and Judge Corman affirmed that, and I see no basis to overturn that on appeal, that finding. On the issue of whether there was true alluding, there's a video in the record, the body camera of the tribal police officer, that's exhibit, hearing exhibit C. And so that'll take you through the chase. You can see, you'll hear the sirens, the red and blue lights flashing and the sirens as the defendant is leading the officer on a chase. He pulls over. You can see the car. You can see that there's not a police marking on the car, but you can see the front of the car in the video and see that the lights are there. And you can see the siren hooked up to it. So there's no doubt in the defendant even admitted he knew the police were trying to get him to stop. He just decided not to stop because he wanted to get back to his mother's house. And so I don't think there's anything that was an abuse of discretion or any clear evidentiary error in this case. What about the argument, though, that the car not being marked is sort of a technical reading of the statute requires that the car be marked. And there's a separate provision for a signal, including sirens and lights. And to say that sirens and lights also meets the marking is to create surplus age in the in the statute. What about as a sort of a statutory argument? What's your response to that? Well, you know, I can't change the facts. That's true. There was not a police marking on the car. I don't think it's necessarily surplus age. I think the point of the statute is is that you have to know it's a police officer. There's no doubt that he did. It is marked with equipment marked by sound. But I can't dispute that the logo was not on the side of the door. Of course, when he's looting the police officer, you can't see the sides of the door. All they can see are the sirens or hear the sirens and see the lights. But there's nothing I can do to change the facts. It was not marked with the words police on the side. And you can see that in the video. But I think as Judge Corman explained, I don't think it's an abuse of discretion or clearly erroneous to find that this was identified, marked as a police officer. In his mind, certainly the defendant. There was also a substantive or is also a challenge to the sentence. I think the procedural argument is that the defendant did not object or is that the court relied on objected to portions of the supplemental PSR. But as the court noted, those were sections that had been in every PSR since the first original conviction. And he never objected to those. And so under this case cited by the court, the United States v. Menteer, when he didn't object to any of those findings about the description of the murder, those were admitted, deemed admitted. So and there's really not a lot of dispute about what happened in the case in terms of the murder. So I don't see how that could ever be anything other than harmless if there was procedural error. And then you have the substantive reasonableness argument. Eagle chasing was sentenced 168 months on the original term. He got when he first violated, he got 10 months more. When he violated again, he got an initial 20 months. And on this third supervised release violation, he got an additional 30 months. So when you total it up of his sentence, he will have been sentenced to serve a total of 228 months, which is less than 20 years in prison for having been a multiple felon who took a knife and stabbed it into the heart of his girlfriend when she knocked over dominoes. Most folks substantively, I think, or objectively would say that's not enough time for a murder. It certainly wasn't substantively unreasonable under the law. And the irony here is that in making a jurisdictional argument that this did not occur in Indian country, it certainly did occur in Indian country. And I can go into that if the court would like me to. No doubt that it did. Zero. But if it hadn't and the state had jurisdiction in this case, Eagle chasing would have been subject to a mandatory life sentence under South Dakota law for a second degree murder. He would have been in prison for life. So federal jurisdiction benefited Mr. Eagle chasing in this case. I would ask this court affirm if it has no other questions. This was a reasonable return to prison by Mr. Eagle chasing who keeps over and over violating the conditions of a supervised release. Thank you, Your Honors. Hearing no other questions. Mr. Bell, I think you have a couple of minutes for rebuttal. Thank you, Your Honor. Please record. I would as it relates to the I'll start at the end and work backwards since that's where Mr. Parsons was. You know, I would just as it relates to the menteer and procedural aspects of the unreasonable sentence argument. Menteer applies to not objecting to the specific proceeding that you're in. There's there's nothing in that menteer decision that states that on some sort of prior proceeding, if you don't object that that's a waiver for a future addition. So I don't believe that the court reasonably relied on menteer. Certainly, that would be the case if there was no objection filed on that specific proceeding. But that wasn't the case here. There was an objection to the extent that the court wanted to rely on that. The U.S. Attorney's Office would have needed to put evidence on to support that. The factual basis statement petition to plea was simply the indictment language. So the additional fact finding that was done was not appropriate by the court. Moving back to the argument relating to the whether it was substantial evidence for sufficient evidence for conviction. I would simply state, you know, the language of the ordinance is clear. And that's that the officer given the signal shall be in a vehicle appropriately marked, showing it to be an official police vehicle. That's plain language. It can't get any more clear than that. And it was not disputed by the U.S. attorney. But it wasn't it wasn't marked. There was nothing on it saying it was an official police vehicle. There may have been sirens on it, but there was nothing that showed it was. It doesn't meet that standard. And when there's a specific provision and the release conditions that says that if there's an unforeseen circumstance, call up the probation office for 72 hours. I would say that an assault is an unforeseen circumstance. And Mr. Eagle Jason acted appropriately as he was supposed to. I rely on the briefing for the rest of the remaining arguments that we have. And thank you for your time and hearing this case. Thank you, counsel. We appreciate your appearance and arguments today. We note, Mr. Bell, that you're appointed and we appreciate you accepting the appointment. And I think you're actually sticking around for the next argument, if I recall right. I am, your honor. Thank you. Very well. So this case will be submitted and decided in due course. And Ms. Rudolph, would you.